UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                              :

BORGHESE TRADEMARKS INC.,        :
BORGHESE INC., and BORGHESE     :
INTERNATIONAL LIMITED,        :
                              :
                 Plaintiffs,    :
                              :

          -against-         :        10 Civ. 5552 (JPO) (AJP)
                              :
FRANCESCO BORGHESE, AMANDA   :       MEMORANDUM AND
BORGHESE, SCIPIONE BORGHESE,   :          ORDER
LORENZO BORGHESE, KATIE BORGHESE, :
MULTIMEDIA EXPOSURE INC., GT    :
PARTNERS LIMITED, PERLIER INC., EBPD :
LLC, ORLANE INC. and HSN INC.,    :
                              :
                 Defendants.  :
                              :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       This action involves several claims and counterclaims between plaintiffs Borghese

Trademarks Inc. ("BTI"), Borghese Inc., and Borghese International Limited ("BIL")

(collectively, "Plaintiffs" or "Borghese") and defendants Francesco Borghese, Amanda

Borghese, Scipione Borghese, Lorenzo Borghese, Katie Borghese, Multimedia Exposure, Inc.

("MME"), GT Partners Limited, Perlier, Inc., EBPD, LLC, Orlane, Inc., and HSN, Inc. ("HSN")

(collectively, "Defendants") under, *inter alia*, the Lanham Act, codified at 15 U.S.C. §§ 1051 et

seq.

       Plaintiffs market and sell products including cosmetics, skin, hair, and nail care products,

and other consumer goods all sold under the Borghese name trademark (the "Borghese-branded

products"). (Dkt. No. 74 ("Pls.' Statement of Undisputed Fact" ("SUF")); *see also* Pls.' Ex. 120

1

("Mosbacher Dep.") at 14:24-15:4.)  Plaintiffs brought this action as a result of Defendants'

alleged use of Plaintiffs' trademarks in connection with Defendants' sale, advertising, marketing,

and promotion of home fragrances and bath, body, and skin care products for humans and pets.

(Dkt. No. 1 ("Compl.") at ¶ 25.)  Also at the center of this action is a 1993 agreement between

the parties (*Id.* at Ex. A ("the 1993 Agreement")), which each side claims has been breached by

the other.

Plaintiffs and Defendants have both moved for partial summary judgment.  In their

motion, Plaintiffs argue (1) that Francesco Borghese is liable for breach of contract as a matter of

law, and (2) that Defendants' counterclaims for false advertising, breach of contract, and unjust

enrichment all fail as a matter of law.  Defendants argue in their motion (1) that Plaintiffs' claims

for trademark infringement are barred by the doctrine of laches, (2) that Plaintiffs have no

intellectual property right in the Borghese family history, and (3) that Plaintiffs cannot make out

prima facie breach of contract claims against either MME or Francesco Borghese.  For the

reasons that follow, both motions are granted in part and denied in part.

## I.    Background

This litigation concerns the value of the intellectual property of the Borghese family

name.  Indeed, Plaintiffs claim that the Borgheses' rich family history "gives allure and cache" to

the "Borghese" Brand.  (Compl. at ¶ 35.)  The Borghese family lineage is replete with prominent

figures, including Pope Paul V, Cardinal Scipione Borghese, Pauline Bonaparte (the sister of

Napoleon) and numerous princes and princesses.  (Dkt. No. 83 ("Defs.' SUF") at ¶¶ 13-14.)  In

the modern era, the Borghese family is perhaps best known for one such princess, Princess

Marcella Borghese ("the Princess"), who began the family legacy in the beauty industry.  (*Id.* at

¶ 20; Pls.' SUF at ¶ 4.)

A.      Origin and Growth of the Borghese Brand

In 1937, and after marrying Prince Paolo Borghese, the Princess began having her cosmetics specially made for her.  (Pls.' SUF at ¶ 7.)  As a fashion and beauty icon the world over, in the late 1950s Princess Marcella Borghese attracted the attention of Charles Revson, founder of Revlon Overseas Corporation, C.A. ("Revlon").  (Compl. at Ex. G.)  The two entered into a partnership on October 16, 1957, to create a Princess Marcella Borghese line of cosmetics from the secret recipe for cosmetics and skin creams that she had commissioned.  (Pls.' Ex. 3 (the "1957 Agreement").)  On January 1, 1958, the contract between Revlon and Princess Marcella Borghese took effect and the Borghese cosmetics line was officially born.  (*Id.* at 1.) The contract guaranteed a four-year partnership, ending December 31, 1962.  (*Id.* at 1.)

From 1958 until 1976, Princess Marcella Borghese controlled the Borghese brand, and with help from her partnership with Revlon, advertised, promoted, marketed, distributed, and sold Borghese products in the United States.  (1957 Agreement; Pls.' Ex. 121 ("Petrocelli Dep.") at 301:17-24.)  On July 1, 1976, Revlon acquired all of Princess Marcella Borghese's right, title, and interest in and to "the words and phrases BORGHESE, MARCELLA BORGHESE, PRINCESS MARCELLA BORGHESE, and all counterparts, renewals, substitutions, simulations and variations thereof, whether used as a personal name, trade name or trademark" and any registrations and applications for the same along with the associated good will.  (Pls.' SUF at ¶¶ 13, 16; Pls.' Ex. 4 ("the 1976 Agreement") at ¶¶ 1-2.)  Through the execution of the 1976 Agreement, Revlon also gained exclusive license to the Princess' family history and crest. (1976 Agreement at ¶ 6.)  Unlike the previous 1957 Agreement, the 1976 Agreement bound the signatories—Prince Paolo Borghese and the Princess—as well as their heirs.  (*Id.* at ¶ 11.)

3

In 1990, the Princess and Revlon amended the 1976 Agreement, incorporating the same terms as the previous contract.  (Pls.' Ex. 6 ("1990 Agreement").)  Pursuant to the amended 1990 Agreement, the Princess acknowledged that Revlon was the sole owner of the trademarks "BORGHESE," "MARCELLA BORGHESE," and "PRINCESS MARCELLA BORGHESE" as they applied to "men's and women's fragrances, cosmetics, beauty treatment products, skin and hair care products, sun tan preparations, nail care products, and jewelry, clothing and clothing accessories sold in conjunction with and to promote such products."  (1990 Agreement at ¶ 1.)

**B.      The 1993 Settlement Agreement**

On January 17, 1992, Revlon assigned the 1976 Agreement and the 1990 Agreement to Halston Borghese International Limited ("HBIL").  (1993 Agreement at Preamble ¶ 4.) Following HBIL's purchase of the Borghese brand from Revlon, there was "some disagreement between [the Princess and her sons Livio and Francesco Borghese] and HBIL concerning the meaning of the 1990 Agreement and its assignment, with the 1976 Agreement, to HBIL.  (*Id*. at Preamble ¶¶ 5.)  To "resolve their differences amicably," the disputing parties executed the 1993 Agreement, which conveyed ownership of certain intellectual property rights to HBIL, now Plaintiff BIL.  (*Id*. at Preamble ¶ 6; *id.* at § II.A.)

Under the 1993 Agreement, the Princess and Francesco Borghese receive royalty payments in connection with the sale of cosmetic products until one year following the Princess's death, and for the sale of non-cosmetic products for the remainder of Francesco's life. (*Id*. at § III.B.)  In exchange, the Agreement provides that HBIL receives the following rights in the "Borghese Name":

> To the extent Princess Marcella Borghese and her Eligible
> Descendants[1] have the authority to do so, the Princess has
> assigned, transferred and conveyed all the right, title and interest of
> the Princess in and to the BORGHESE name as applied to any and
> all consumer products.  Notwithstanding the foregoing, the
> Princess does not represent, warrant or covenant that the Princess
> has assigned to HBIL the exclusive right, title or interest in or to
> the BORGHESE name as it is applied to Other Consumer
> Products.

(*Id*. at § IV.H.)  Elsewhere, the Agreement explains that "[t]he Princess [as defined] has no right

whatsoever to own, use or license any of the Intellectual Property, except to the extent that such

ownership and use would not be inconsistent with the rights of HBIL as set forth herein."  (*Id*. at

§ II.D.)  It also provides that the signatories from the Borghese family must "refrain from being

engaged by or interested in any other business, firm or corporation which directly or indirectly is

in competition with HBIL in its business of selling . . . consumer products and services related

thereto, without the prior written approval of HBIL."  (*Id*. at § IV.G.)

The Agreement also includes the following obligation of the signatory Defendants:

> A. Protection of Intellectual Property.  The Princess [as defined]
> shall do whatever HBIL reasonably requests to obtain and protect
> HBIL's Intellectual Property . . . Further, the Princess [as defined]
> will, at HBIL's request and expense, assist in the enforcement of
> Intellectual Property against infringing uses by others as may be
> deemed reasonably necessary by HBIL.  The Princess [as defined]
> shall promptly inform HBIL of any suspected infringements of
> which the Princess has actual knowledge.

(*Id*. at § IV.A.)

Finally, the Agreement contains the following provision concerning the duty of HBIL to

maintain a certain quality of their products ("the Quality Provision"):

---

[1] The parties agree that the 1993 Agreement binds not only the Princess herself but also Livio and
Francesco Borghese.  (*See* 1993 Agreement at § V.)  The 1993 Agreement defines "Princess" to
include her "Eligible Descendants [defined as Livio and Francesco] and any corporate or other
legal entities under their respective control." (1993 Agreement at § I.K.)

D. Quality: In order to ensure that the Princess is not subjected to public ridicule or contempt, HBIL agrees that the Intellectual Property shall be used only on consumer products, and services related thereto, of a quality customarily sold or provided through stores of high reputation and prestige; provided, however, that neither the foregoing, nor anything else in this Agreement, shall limit or be construed as limiting HBIL's ownership rights in and to the Intellectual Property.

(*Id*. at § III.G.)

## C.     Modern History of the Borghese Brand

To this day, the Borghese-branded products are available throughout the world. (Petrocelli Dep. at 101:21-23.) In the United States, Borghese-branded products are sold at cosmetics boutiques and department stores, including Bloomingdale's and Lord & Taylor. (Pls.' Ex. 122 ("Palladino Dep.") at 179:11-14.) Certain Borghese products under the "Kirkland Signature, by Borghese" brand ("KS By Borghese") are now available nationwide at Costco stores, and at more than 17,000 pharmacies nationwide, including CVS, Walgreens, Rite Aid, and Duane Reade. (Pls.' SUF at ¶ 33; Compl. at ¶ 56.) Borghese also has a presence in the television shopping world; beginning in 2010, its products were also available for sale on QVC (Pls.' SUF at ¶ 31.) In addition, Borghese products have expanded beyond cosmetics and skin and nail care products to include eyewear products also available throughout the United States and distributed in more than 5,000 stores. (Compl. at ¶ 59.)

## D.     The Defendants

### 1.     Borghese Family Members

The Princess's oldest son, Francesco, is married to Amanda Borghese. Francesco and Amanda have two sons, Scipione (also referred to as "Skip") and Lorenzo Borghese. Katie Borghese is Scipione's wife and Francesco's daughter-in-law. (Defs.' SUF at ¶¶ 8-12.) These persons are the individual Defendants in this case.

2.      **Defendant MME**

Multimedia Exposure, Inc. ("MME"), a defendant corporation, was founded in 1996 by
Francesco, Amanda, and Scipione Borghese.  (Pls.' Ex. 116 ("MME Dep.") at 44:4-9.)  MME
has two different businesses, one involving the sale of its products on television and the other
involving consulting work, which includes counseling clients regarding the sale of their products
on television, negotiation of contracts, and review of accounts receivable.  (Pls.' Ex. 115
("Francesco Dep.") at 25:2-9.)

In addition, MME owns, manufactures, and markets a range of brands and product lines.
Under the "Italian Pet Spa by Lorenzo Borghese" name, Lorenzo and MME sold a variety of
high-end pet skin care products to Petco.  (Pls.' Ex. 62.)  Lorenzo and MME also sold pet skin
care products under the name "La Dolce Vita by Prince Lorenzo Borghese" to PetSmart.  (Pls.'
Ex. 63.)  The Casa di Francesca products use a crest to brand the products, but it is not the
Borghese crest. (Pls.' Ex. 66.)  The Casa di Francesca products, launched on November 7, 2008,
are "a collection of home fragrances and accessories inspired by the exotic aromas proprietress
Francesca brought home to her Italian family in the 1600s from her adventurous grand tour of
old world Europe."  (Pls.' Ex. 93 (quoting HSN "Brand Strategy Summary").)  Francesco,
Amanda, Lorenzo, Scipione, MME, and HSN (collectively, the "Royal Treatment Defendants")
advertise, market, promote, distribute, offer to sell, and sell Royal Treatment Products.  (Dkt. No.
16 ("Answer") at ¶ 78.)

In or about 2009 or early 2010, Lorenzo became the Executive Vice President of MME.
(Pls.' Ex. 18.)  Since September 11, 2009, Scipione Borghese has served the President of MME
and Lorenzo as the Secretary.  (Pls.' Ex. 17.)  The two men own all of the outstanding shares of
MME stock.  (*Id.*)  From September 11, 2009 through at least January 28, 2011, Amanda

Borghese served as Vice President of MME, handling sales, marketing, and public relations. (*Id.*)

### 3. HSN and MME Partnership

MME is the "vendor of record" for several products to HSN, a company in the business of television and online sales broadcasting live all day, seven days a week, 364 days a year. (MME Dep. at 92: 7-10; Pls.' Ex. 15.)  Since 2002, Lorenzo has appeared on HSN as an on-air guest[2] for Royal Treatment Products.  (MME Dep. at 16:22-25; Countercls., Ex. 2 at ¶30.)  Katie and Amanda have appeared as HSN on-air guests on behalf of products for which MME is the vendor as well.  (MME Dep. at 16:19-21; Ex. 123 ("Tappan Dep.") at 29:9-19.)

The Borghese family provided to HSN the background information about themselves and their family to be used in connection with their on-air appearances.  (Pls.' Ex. 47; Pls.' Ex. 117 ("Scipione Dep.")  at 88:22-89:13.)

### 4. Perlier, Elariia, Orlane, EBPD

Perlier and its affiliated entities own the brands and product lines marketed and sold under the names of Italian Bath & Body, Italian Beauty, Perlier, and Elariia (collectively, "Italian Bath & Body Products").  (Pls.' SUF at ¶ 67.)  Orlane is in the business of selling high-end skin care products and services.  (*Id.* at ¶ 68.)  EBPD is in the business of distributing Perlier and Elariia products in the United States and is a wholly owned subsidiary of Orlane.  (*Id.* at ¶ 69.) From 1984 to around 1994, Francesco owned La Perfumerie, Inc. ("LPI"), which distributed Perlier products in the United States.  (*Id.* at ¶ 70.)

These companies share many connections.  From 1990 to 1995, LPI shared employees and office space with Orlane.  (*Id.* at ¶¶ 72-73.)  Francesco Borghese acted as president of Orlane

---

[2] HSN defines an "on-air guest" or "brand ambassador" as the representative of the brand who appears on live television to sell the product.  (Pls.' SUF at ¶ 44.)

from 1986 to 1994.  (*Id.* at ¶ 74.)  He then served as president of Perlier from 1994 to 2001.  (*Id.* at ¶ 75.)  Orlane, EBPD, and Perlier share some employees.  (*Id.* at ¶ 80.)  From 1995 through the mid-2000s, Perlier, Inc. was the distributor of Perlier products in the United States.  (*Id.* at ¶ 81.)  EBPD took over the role of U.S. distributor of Perlier and Elariia products in the mid-2000's.  (*Id.* at ¶ 82.)  Currently, EBPD is the "vendor of record" for the sale of Perlier and Elariia products to HSN.  (Pls.' Ex. at 119 ("Sandbach Dep.") at 226:15-17.)

Francesco, Amanda, Scipione, Lorenzo, MME, Perlier, EBPD, Orlane, and HSN (collectively, the "Italian Bath & Body Defendants") advertise, market, promote, distribute, and sell the Italian Bath & Body Products.  (Pls.' SUF at ¶ 84.)  Since 1991, Scipione Borghese has held the responsibility for Perlier's advertising, marketing, branding, and promotion strategy as it related to the Italian Bath & Body Products.  (*Id.* at ¶ 88.)

On December 31, 2001, Scipione individually, and then Borgh, Inc., a company wholly owned by Scipione, executed a consulting agreement with Perlier to represent both Perlier and Elariia as the on-air guest for HSN in connection with the Italian Bath & Body Products.  (*Id.* at ¶ 86.)  Similarly, Amanda Borghese entered an agreement individually with Perlier to represent Perlier and Elariia as the on-air guest on HSN in connection with the same products.  (*Id.* at ¶ 87.)

### 5.    Francesco Borghese's Involvement

Francesco is the founder of MME and a current member of its board.  (Pls.' SUF. at ¶¶ 120, 128.)  To the present day, Francesco is an advisor to MME and since 2004 has been on the company's payroll, earning approximately $75,000 annually.  (*Id.* at ¶¶ 128-30.)  Francesco has also served as treasurer of MME, and some evidence indicates that he is still a company officer.  (Pls.' Ex. 23.)  Since 2003, Francesco has also earned approximately $10,000 per month from

9

Borgh, Inc. for aiding Scipione in negotiating his consulting agreement with defendant Perlier, and it is stipulated that he will continue to earn that amount for "as long as [Scipione is] with Perlier." (Scipione Dep. at 191:10-23.)  Francesco was also listed as an MME contact for the pet products sold at PetSmart.  (Pls.' SUF at ¶ 132; Pls.' Ex. 24 at D404447.)  In September 2009, the ownership structure of MME was changed for "family planning reasons"; Scipione and Lorenzo became the sole shareholders of MME on September 11, 2009, to the exclusion of Francesco Borghese.  (Pls.' SUF at ¶¶ 134-36.)

### 6.    Lorenzo Borghese's Television Appearance

Lorenzo's involvement in this lawsuit stems not only from his business ventures, but also from his time as the star of "The Bachelor: Rome," the ninth season of the hit ABC reality television series "The Bachelor."[3]

In April 2006, Lorenzo spoke with representatives of Borghese about the possibility of Lorenzo promoting the Borghese brand on *The Bachelor: Rome*.  (Pls.' Ex. 118 ("Lorenzo Dep.") at 37:25-38:21.)  In connection with these negotiations, ABC shot a segment of Lorenzo in the Borghese offices.  (Petrocelli Dep. at 394:4-395:7.)  Nonetheless, negotiations broke off, and the parties made no agreement as to how the footage should be used.  However, a ten-second promotional segment filmed at Plaintiffs' offices was aired on the talk show *Extra* on October 2, 2006, in anticipation of the first episode of the season.  (Pls.' Ex. 113.)  In the clip, Lorenzo walks past the Borghese signage in the Borghese offices.  (*Id.*)  However, no Borghese products are featured in the segment.  (*Id.*)

---

[3] The Court takes judicial notice that, after a tense two-hour season finale, Lorenzo selected Jennifer Wilson as that season's winner.  *See* Reality TV World Staff, *"Bachelor Rome" Ends with Lorenzo Borghese Picking Jennifer Wilson* (Nov. 28, 2006), http://www.realitytvworld.com/news/bachelor-rome-ends-with-lorenzo-borghese-picking-jennifer-wilson-4435.php.

### E.      Procedural Background

Plaintiffs commenced this lawsuit on July 21, 2010.  The underlying action seeks preliminary and permanent injunctive and monetary relief for (a) trademark infringement pursuant to 15 U.S.C. § 1114; (b) trademark infringement, false designation of origin, and unfair competition pursuant to 15 U.S.C. § 1125(a); (c) state trademark infringement and unfair competition; (d) deceptive trade practices under N.Y. Gen. Bus. Law § 349; (e) breach of contract under New York common law; (f) trademark dilution under N.Y. Gen. Bus Law § 360-1; and (g) unjust enrichment under New York state common law.  (Compl. at ¶ 31.)

Defendants filed an Answer on September 27, 2010, asserting twenty-one (21) affirmative defenses.  (Answer and Countercls.)  Defendants also asserted five counter-claims: (1) unfair competition, false representations, and false advertising pursuant to 15 U.S.C. § 1125(a); (2) breach of contract relating to the 1993 Settlement Agreement between the parties; (3) deceptive acts and practices and false advertising under N.Y. Gen. Bus. Law. §§ 349-50; (4) common law unfair competition; and (5) unjust enrichment.  *Id.* at ¶¶ 60-83.

On January 17, 2012, both parties moved for partial summary judgment.  (Dkt. No. 78 ("Pls.' Mem."); Dkt No. 82. ("Defs.' Mem.").)  The parties opposed each others' motions on January 31, 2012 (Dkt. No. 87 ("Defs.' Opp'n."); Dkt. No. 92 ("Pls.' Opp'n.") and replied on February 22, 2012. (Dkt. No. 97 ("Pls.' Reply"); Dkt. No. 101 ("Defs.' Reply").)  These motions are currently before this Court.

## II.      Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment "is appropriate when the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp.

2d 262, 265-66 (S.D.N.Y. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986)) (internal quotation marks omitted).  In such cases, the non-moving party must respond to

the adverse party's pleading with "specific facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 248.  The Supreme Court has instructed that an issue of fact is "genuine"

if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*

  The initial burden of a movant on summary judgment, or partial summary judgment, is to

provide evidence on "each material element of his claim or defense" illustrating his entitlement

to relief.  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  A fact is

"material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477

U.S. at 248.

  The Court must view all evidence and facts "in the light most favorable to the non-

moving party and draw all reasonable inferences in its favor."  *In re Old Carco LLC*, 470 B.R.

688, 699-00 (S.D.N.Y. 2012) (quoting *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995)).  To

prevail on a claim for summary judgment, it must be shown that "no reasonable trier of fact

could find in favor of the nonmoving party."  *Id.*; *accord Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party must advance more than mere

"conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary

judgment.  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S.

at 587); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." (internal citations omitted)).

### III.    Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment, contending that (1) Plaintiffs' trademark claims are barred by laches, (2) Plaintiffs cannot make out a prima facie case for unjust enrichment under the Lanham Act, (3) Defendants did not assign to Plaintiffs the rights to the Borghese family history via the 1993 Agreement, (4) MME is not bound by the 1993 Agreement, and (5) Plaintiffs cannot make out a breach of contract claim against Francesco Borghese.

### A.    Trademark Infringement and the Doctrine of Laches

Defendants have moved for summary judgment on all of Plaintiffs' trademark claims (Counts I-IV) based on Defendants' "use of their surname and family history when promoting PERLIER and ELARIIA products on HSN." (Defs.' MSJ at 3.)  Defendants contend that all such claims are barred by laches.

Laches is an equitable doctrine which, when properly invoked, can serve as a complete defense to state and federal trademark infringement claims.  *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1040-41 (2d Cir. 1980).  In Lanham Act cases, this Court has granted motions for summary judgment based upon laches defenses.  *See, e.g.*, *Eppendorf-Netheler-Hinz GmbH v. Enterton Co.*, 89 F. Supp. 2d 483 (S.D.N.Y. 2000) (granting defendants' motion for partial summary judgment based on laches).  Be that as it may, a laches defense "usually requires the kind of record only created by full trial on the merits."  *Kamat v. Kurtha*, No. 05 Civ. 10618 (KMW)(THK), 2008 WL 5505880, at *6 (S.D.N.Y. Apr. 14, 2008) (citing *Country Floors, Inc. v. P'ship Composed of Gepner and Ford*, 930 F.2d 1056 (3d Cir. 1991)).  Because the "equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case . . . [t]he inquiry is a factual one."  *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994) (citations omitted).

In order to successfully invoke a laches defense, Defendants must prove (1) "that plaintiff had knowledge of defendant's use of its marks," (2) "that plaintiff inexcusably delayed in taking action with respect thereto," and (3) "that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Saratoga Vichy Spring Co.*, 625 F.2d at 1040 (internal citations omitted).  Additionally, the Court cannot permit a laches defense if Defendants have acted in bad faith. *See Hermes Int'l v. Lederer de Paris Fifth Ave. Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (explaining that "intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor to be weighed in balancing the equities, as the district court did in this case.")  Laches is presumed if the Lanham Act violation persists for six years before a claim is filed. *Conopo, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996); *Deere & Co. v. MTD Holdings*, *Inc.*, No. 00 Civ. 5936 (LMM), 2004 WL 324890, at *18 (S.D.N.Y. Feb. 19, 2004).  "This six-year period will begin to run once the plaintiff is aware of the facts underlying its cause of action." *Id.* (citations omitted).

Defendants contend that the doctrine of laches bars infringement claims relating to the use of the Borghese surname and family history in the promotion of Perlier and Elariia products on HSN, because the complained-of use has existed for two decades, and Plaintiffs knew, or should have known, of such use.  Defendants have submitted a video montage of QVC and HSN clips from the 1990s containing passing references to Scipione and Amanda's surnames and titles, as well as some brief references to the family history of the Borgheses, "one of Italy's founding families," and to the Borghese museum. (Defs.' Ex. M).  Scipione Borghese has also submitted a declaration averring that he and his mother have "consistently used [their] names and titles" and "referred to [their] family history as part of [their] sales efforts.  (Dkt. No. 84 ("Scipione Decl.") at ¶¶ 14-15.)  Plaintiffs, by contrast, argue that the complained-of

infringement dates back not to the 1990s, but to November 2005.  This, according to Plaintiffs , is the actual period in which Defendants began to use Plaintiffs' trademarks and to reference the history of the Borghese brand.  (Pls.' Opp'n. at 4.)

This Court agrees with Plaintiffs that, given the brevity of the montage put forth by Defendants and the conclusory nature of Scipione Borghese's declaration, the question whether any substantial infringements took place before 2005 cannot be determined as a matter of law. Plaintiffs have put forth evidence indicating that the first attempts by Lorenzo, in connection with Royal Treatment, to associate himself on air with the Princess and "the Borghese cosmetic line" were made in December 2004, and the first such maneuvering during the promotion of Defendants' Italian Bath and Body product line occurred in November 2005.  (Pls.' Ex. 218 at 11-12.)  Such references to the Princess, her cosmetic line, and their connections to the Borghese Defendants happened quite frequently thereafter.  (*See, e.g.*, *id.* at 14, 17-18 (similar references on December 6, 2006, November 1, 2007, January 24, 2008, March 7, 2008, April 4, 2008, and April 28, 2008.))  As far as this Court can determine, however, Defendants made no references to the Princess or her cosmetic line, on either QVC or HSN, before the end of 2004.

Even if Defendants' conduct had persisted for several decades, Defendants would also need to demonstrate that Plaintiffs knew or should have known about this conduct.  Defendants argue that Plaintiffs were on notice of any past use because the Borghese family signatories to the 1993 Agreement reserved the right to "appear in a video or appear on television and/or radio programs," which should have prompted the Plaintiff to inquire as to the family members' desire to be on television.[4]  (1993 Agreement at § II.D.)  Defendants also contend that "Plaintiffs had to

---

[4] Defendants have cited Second Circuit precedent indicating the existence of a duty to inquire. *See RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 410 Fed.Appx. 362, 365 (2d Cir. 2010) (citing *Johnston v. Standard Min. Co.*, 148 U.S. 360, 370 (1893)) ("[T]he law is well settled that where

have known by 2000 [that Defendants used the family name and heritage] when they hired Neil Petrocelli as Marketing Director."  (Defs.' Mem. at 4.)  For their part, Plaintiffs claim that they had no knowledge of the infringements until September 30, 2009.  (Pls.' SUF at ¶ 142; Pls.' Ex. 203).

Irrespective of whether Defendants have proffered enough evidence to show as a matter of law that Defendants used the Borghese and Princess Marcella Borghese marks in the 1990s, this Court cannot conclude, undisputedly as a matter of law, that Plaintiffs knew or should have known of these past infringements.[5]  It is one thing to expect a company to monitor for infringements; it is quite another to expect it to spot several isolated minutes of infomercial footage over several years.  While Defendant is correct that a party claiming infringement can be charged "with such knowledge as he might have obtained upon inquiry," inquiry notice is triggered only if "the facts already known by [plaintiff] were such as to put upon a man of ordinary intelligence the duty of inquiry."  *Polaroid Corp. v. Polarad Elecs. Corp.*, 182 F. Supp. 350, 355 (S.D.N.Y. 1960) (citing *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893).

the question of laches is in issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."); *Black Diamond Sportswear, Inc. v. Black Diamond Equip, Ltd.*, No. 06 Civ. 3508, 2007 WL 2914452 (2d Cir. Oct. 5, 2007).  However, these are cases, distinguishable from the case at bar, in which plaintiffs had every reason to know about the infringer's conduct.  For instance, in *Black Diamond*, the infringer's products directly competed with the plaintiff's years before the latter brought its claim, and the two companies marketed their goods in the same magazines and trade shows.  *Id*. at *3.

[5] Moreover, it is not necessarily the case that the statute of limitations begins to run at the time of discovery.  Instead, "a plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known, not simply that the defendant was using the potentially offending mark, but that plaintiff had a provable infringement claim against defendant."  *ProFitness Physical Therapy Ctr v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) (citing *Kellogg Co. v. Exxon Corp., v*, 209 F.3d 562, 570-71 (6th Cir. 2000)).  Thus, to the extent that Plaintiffs were aware of earlier, minor infringements, such incidents do not necessarily commence the six-year clock.

Nor does this Court find persuasive Defendants' argument that knowledge of the HSN footage should be imputed to Defendants through Borghese's current vice president, Neil Petrocelli, because Petrocelli worked for LPI, the distributor of Perlier products, from 1998-2000.  Petrocelli's deposition testimony indicates that, while at LPI, he had no involvement with the branding or selling of Perlier on television, and that he never saw a taping of Amanda and Scipione's television appearances.  (Pls.' Ex. 216 ("Petrocelli Dep. II") at 46:2-48:8.)  This Court fails to see how the fact that "[a]t least as early as 2000 . . . [Petrocelli] knew that Scipione Borghese sold cosmetic products on television" necessarily proves that Petrocelli, and by extension Plaintiffs, knew of the potential infringements.  (Defs.' Reply at 3.)  Defendants have not put forward evidence sufficient to show beyond genuine dispute that Plaintiffs knew or should have known of Defendants' pre-2005 use of the Borghese trademark.

Even if Defendants had shown that laches was applicable under the standard test, this Court would not bar Plaintiffs' claim here; as is explained in section III.B.2, *infra*, viewing the facts in the light most favorable to Plaintiffs, the evidence indicates that there is at least a genuine dispute of fact as to whether Defendants have acted in good faith.  *See Cuban Cigar Brands N.V. v. Upmann Int'l., Inc.*, 457 F. Supp. 1090, 1098-99 (S.D.N.Y. 1978) (explaining that the burden for establishing good faith falls upon the party invoking the affirmative defense of laches).

Thus, this Court cannot conclude at this stage of the litigation that Plaintiffs' suit is barred by laches.

### B.     Plaintiffs' Unjust Enrichment Claim

Defendants next move for summary judgment on Plaintiffs' Claim X, concerning the alleged unjust enrichment of Defendants at Plaintiffs' expense.  (*See* Compl. at ¶ 136.)

Pursuant to § 35(a) of the Lanham Act:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117(a).  In order to succeed on its Lanham Act claim for unjust enrichment in this Circuit, a plaintiff must prove: (1) that the infringer acted in bad faith; and (2) either (a) actual consumer confusion or (b) intentional deception on the part of the defendant.  *Int'l Star Class Yacht Racing Ass'n. v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996)); *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 493 (2d Cir. 1998). [6]  The Second Circuit has cautioned district courts against making factual determinations about the validity of infringement claims at the summary judgment stage of the litigation.  *See, e.g., DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 26 (2d Cir. 1982) (reversing the lower court for making factual determinations and thereby "disregard[ing] well-known principles of summary judgment"); *American Int'l. Group, Inc. v. London American Int'l. Corp.*, 664 F.2d 348, 353 (2d

---

[6] The law of the Circuit regarding the requisite showing for receiving damages under this statute is, in light of the Trademark Act of 1999, somewhat unclear, and a division exists in this District over whether pre-Amendment Second Circuit case law remains intact.  *See Chanel, Inc v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 268-69 (S.D.N.Y. 2011) (discussing the split within the Southern District of New York).  This Court concludes that Second Circuit precedent from before the 1999 Amendment remains good law, for the reasons given by Judge Cote in *Mastercard Int'l, Inc. v. First Nat'l. Bank of Omaha, Inc.*, No. 02 Civ. 3691 (DLC), 03 Civ. 707(DLC), 2004 WL 326708, at *10-11 (Feb. 23, 2004).

Cir. 1981).  Keeping this in mind, this Court must determine whether, at trial, a reasonable jury

would be able to find that confusion and bad faith were present here.

1.    <strong>Confusion</strong>

While this Court can decide the issue of consumer confusion at the summary judgment

stage "if the court is satisfied that the products . . . are so dissimilar that no question of fact is

presented," "[q]uestions regarding the likelihood of confusion are normally factual in nature"

and are thus are often not amenable to disposition by summary judgment.  *R.F.M.A.S., Inc. v.*

*Mimi So*, 619 F. Supp. 2d 39, 82 (S.D.N.Y. 2009) (citing *Universal City Studios, Inc. v. Nintendo*

*Co., Ltd.,* 746 F.2d 112, 116 (2d Cir. 1984)).

In the Second Circuit, the likelihood of confusion between a trademark and an alleged

infringer is determined by weighing the eight so-called *Polaroid* factors, famously enumerated

by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495-96 (2d Cir.).

The factors are:

> (1) strength of the plaintiff's mark; (2) the degree of similarity
> between the two marks; (3) the proximity of the products; (4) the
> likelihood that the prior owner will "bridge the gap" . . .; (5) actual
> confusion; (6) the defendant's good faith in adopting its mark; (7)
> the quality of the defendant's product; and (8) the sophistication of
> the buyers.

*Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996).

The Second Circuit has explained that, "[i]f a factual inference must be drawn to arrive at

a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different

conclusion, the district court may not properly resolve that issue on summary judgment." *Id.*[7]

Here, Plaintiff has raised genuine issues of material fact as to several of the *Polaroid* factors,

---

[7] Defendant cites *Playtex Products, Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir.
2004), for the proposition that the balancing of the *Polaroid* factors is a question of law. This is
true, but only to the extent "the predicate facts are beyond dispute."  *Id.*

19

most importantly, the degree of actual confusion.  Plaintiffs' expert, Hal Poret, conducted a survey demonstrating that HSN infomercials created a fifteen-percent level of net confusion with the Borghese brand.  (Pls.' Ex. 133 ("Poret Report") at 11).  The Second Circuit has indicated that this level of net confusion is probative of consumer confusion.  *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979).  Plaintiffs also point to anecdotal evidence of confusion, such as, *inter alia*, an HSN caller's comment to Scipione and Amanda Borghese clearly indicating her belief that they were selling Borghese brand products. (Pls.' Ex. 218-R at D459693 at 20051205_103612.)  Plaintiffs also note an MME business partner's confusion about the source of Borghese products sold on ShopNBC.  (Pls.' Ex. 50 at D435769.)  These anecdotal instances of confusion, when paired with survey evidence of confusion, provide a jury with enough evidence to reasonably conclude that actual confusion existed.  *See Empresa Cubana Del Tabaco v. Culbro Corp.*, No. 97 Civ. 8399 (RWS), 2004 WL 602295, at *44 (S.D.N.Y. Mar. 26, 2004), *reversed on other grounds*, 399 F.3d 462 (2d Cir. 2005) (holding that there is a "likelihood of confusion" where "survey evidence as well as anecdotal evidence of actual confusion" exists).

### 2.    Bad Faith

In seeking summary judgment on Plaintiffs' claim for unjust enrichment, Defendants focus primarily on the issue of bad faith.  According to Defendants, Plaintiffs have proffered insufficient evidence of bad faith for their unjust enrichment claim to survive the summary judgment stage of the litigation.

In order to demonstrate bad faith, a plaintiff must show that the "defendant adopted [the plaintiff's] mark with the intention of capitalizing on [the] plaintiff's reputation and good will and any confusion between his and the senior user's product." *Cadbury* Beverages, 73 F.3d at

482-83 (quoting *Lang v. Retirement Living Publ'g. Co.*, 949 F.2d 576, 583 (2d Cir. 1991).

"Subjective issues such as good faith are singularly inappropriate for determination on summary

judgment," especially when plaintiffs "adequately placed defendants' bona fides in question."

*American Int'l. Group,* 664 F.2d at 353.

Defendants contend that Plaintiffs have put forth no evidence of bad faith or willful

misconduct on the part of Defendants.  Defendants also point to several parts of the record that

demonstrate Plaintiffs' willingness to cooperate with Plaintiffs when possible infringements

arose (*see, e.g.*, Scipione Dep. at 82:12-23 (testifying that Scipione removed references to the

Princess in Perlier marketing materials to placate Defendants)), as well as to Scipione Borghese's

averment that that he never intended "to connect [himself] to the Borghese brand" when

appearing on television,   (*Id*. at 77:3-4.)

Plaintiffs have put forth sufficient evidence of possible bad faith to survive summary

judgment.  For example, Plaintiffs point to a statement by Scipione to Mindy Grossman at HSN,

concerning the development of a Villa Borghese handbag, that he hopes they can "take

advantage" of the "value in the name Borghese."  (Pls.' Ex. 42 at D402846.)  The record also

contains evidence of various HSN appearances from 2005 to 2009, in which Defendants—

particularly Scipione—traded on Plaintiffs' goodwill in connection with the sale, advertising,

and promotion of Perlier and Elariia bath and body products.  For instance, during one HSN

appearance, Scipione asserted that his and Amanda's products were "part of the beauty legacy,"

which "my grandmother started . . . .  My grandmother was Princess Marcella Borghese . . . ."

(Pls.' Ex. 111 (D3655900 at 20090122_080160).)

Additionally, given the fact that the "allegedly infringing mark is identical to [the]

registered mark and its use began subsequent to plaintiff's registration," Defendant has not

sufficiently explained its behavior to rebut the appearance of bad faith beyond genuine dispute. *Cadbury Beverages*, 73 F.3d at 483 (*citing Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1101 (2d Cir. 1969)).[8]

Because issues of material fact exist as to confusion and bad faith, Defendants' motion for summary judgment as to Plaintiffs' unjust enrichment claim must be denied.

### C.   Defendant's Right to Use Borghese History Under the 1993 Agreement

Defendants next argue that, by signing the 1993 Agreement, Plaintiffs waived the right—made explicit in earlier agreements—to use the Borghese family history.  By extension, Defendants contend, Plaintiffs' trademark infringement claims regarding Defendants' use of the Borghese family history are barred by waiver.

Under New York law, "a waiver is the voluntary and intentional relinquishment of a known right, which is not created by negligence, oversight, or silence."  *Amerex Group, Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 201 (2d Cir. 2012) (citation omitted).  In New York, courts do not lightly presume waiver; instead, waiver "must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act."  *Echostar Satellite L.L.C. v. ESPN, Inc.*, 914 N.Y.S.2d 35, 39 (App. Div. 2010); *see also Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed." (citations omitted)).

---

[8] Defendants contend that *Cadbury Beverages* is inapposite, because there the Second Circuit found the two marks "identical—in style as well as in name."  *Id*. at 483.  However, the *Kiki Undies Corp*. Court found that burden shifting should occur when the defendant "adopted exactly the same *word* as plaintiff's mark."  411 F.2d at 1101 (emphasis added); *see also Surgicenters of Am., Inc. v. Med. Dental Surgeries Co.*, 601 F.2d 1011, 1021 (9th Cir. 1979) (citing *Kiki Undies Corp.* for the proposition that "where . . . the allegedly infringing name is identical to the registered mark," the burden shifts).  In any event, even if the burden is on Plaintiffs' shoulders here, there is sufficient evidence to place Defendants' good faith in dispute.

Contrary to Defendants' assertion that "the 1993 Settlement Agreement makes [Plaintiffs'] forfeiture explicit" (Defs.' Mem. at 13), this Court cannot conclude that, by signing the 1993 Agreement, Plaintiffs conclusively relinquished their rights to the Borghese family history.[9]

While Defendants correctly note that the 1993 Agreement is silent as to the Borghese family history per se, the Agreement provides that Borghese assume ownership over, *inter alia*, "subsidiary rights relating to the identity of the Princess." (1993 Agreement at § 1.H.) Genuine issues of material fact exist as to whether these "subsidiary rights" include the Borghese family history. Moreover, through the 1993 Agreement, Defendants "expressly approve[d] the transfer of intellectual property" from Revlon, the owner of the Borghese brand under the prior agreements, to Borghese. (*Id*. at § II.A.) This express approval seems to indicate that Borghese assumed all of the intellectual property rights owned by its predecessor-in-interest, Revlon.

### D.     Breach of Contract Claims against MME

Defendants contend that Plaintiffs cannot make out a prima facie case of breach of contract against MME because MME is not a signatory or party to the 1993 Agreement. The 1993 Agreement binds "the Princess," but the Agreement makes clear that its definition of "Princess" includes both her eligible descendants (Livio and Francesco) and "any corporate or other legal entities under their respective control." (1993 Agreement at § I.K.) Thus, MME is

---

[9] Nor does *Local 65-B, Graphic Commc'ns Conference of the Int'l Bd. of Teamsters v. Nat'l Labor Relations Bd.*, 572 F.3d 342 (7th Cir. 2009), bolster Defendants' argument. In *Local 65-B*, the Seventh Circuit simply makes the observation that a party's waiver of rights from a prior contract can be read to extend to a new contract, as courts can fairly assume that contracting parties understand the "consequences of extending" past agreements. *Id*. at 351. This Court is inclined to agree with Plaintiffs that, if anything, the reasoning in *Local 65-B* favors Plaintiffs here.

bound by the 1993 Agreement only if the company is "control[ed]" by the individuals bound by the 1993 Agreement.

Plaintiffs allege that Francesco Borghese, who is undisputedly bound by the 1993 Agreement, "exercises control, and at all relevant times has exercised control, over [MME] . . . ." (Compl. at ¶ 48.)  Defendants deny that Francesco is, or ever has been, in control of MME. (Defs.' Mem. at 19.)  Under New York law, "'[c]ontrol', including the terms 'controlling', 'controlled by' and 'under common control with', means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract, or otherwise."   N.Y. Bus. Corp. Law § 912(a)(8).

Plaintiffs put forth some evidence that, in the timeframe at issue in this litigation, Francesco has been an influential part of MME.  For instance, Francesco, along with his wife Amanda and son Scipione, founded MME in 1996 (*see* Scipione Dep. at 44:4-9), and it appears that he was and continues to be a member of MME's board and on MME's payroll.  (Pls.' Ex. 17.)  Plaintiffs have also proffered evidence that, despite his claim to the contrary, Francesco remains an officer of MME.  (*See, e.g.*, Pls.' Ex. 23.)  However, there is no evidence in the record that Francesco has, or ever has had, "control" over MME.  Indeed, Plaintiffs offer no evidence to contradict Scipione's testimony that he "was always the majority shareholder and the president."  (Scipione Dep. at 32:17-18.)  Evidence presented by Plaintiffs of Francesco's advisory relationship to his son is not enough to create a genuine issue of material fact as to whether Francesco has "the power to direct or cause the direction of the management and policies."  Therefore, Plaintiffs' breach of contract claims against MME are dismissed.

E.       **Breach of Contract Claims against Francesco**

Defendants move for summary judgment on Plaintiffs' breach of contract claims against Francesco Borghese.  To prevail on a claim for breach of contract a party must prove: "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011); *see also Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York,* 375 F.3d 168, 177 (2d Cir.2004) ("To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" (quoting *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996)).

Defendants do not dispute that, as a signatory to the 1993 Agreement, Francesco had a duty to "promptly inform [Borghese] of any suspected infringements of which [Francesco] had actual knowledge."  (1993 Agreement at § IV.A.)  Pursuant to the Agreement, Francesco also promised to "refrain from using, licensing and/or authorizing another person or entity to use all or any of the Intellectual Property in the sale, offer for sale, advertising or promotion of any consumer products or services related thereto."  (*Id*. at § IV.K(1).)

Defendants argue that Francesco never suspected any infringements of Plaintiffs' mark, and they point to his testimony to that effect.  (*See, e.g.*, Defs.' Ex. 2 ("Francesco Dep. II") at 156:12-22).  However, Plaintiffs have put forth evidence that calls this assertion into question.  For instance, Plaintiffs have shown that, at least as of December 4, 2007, Francesco knew that Scipione made reference to the Princess and the Princess Marcella Borghese Cosmetic Line on the MME website.  (Pls.' Ex. 49.)

25

Plaintiffs have introduced evidence indicating not only that Francesco may have violated his duty to inform under section IV.A, but also that he may have more directly breached the 1993 Agreement.  For example, Plaintiffs note that Francesco authorized MME to portray him on the MME website as "the son of Princess Marcella Borghese – creator of the Princess Marcella Borghese Cosmetics Line." (Pls.' SUF ¶ 112.)  There are genuine issues of material fact as to whether this constituted an infringement.   Accordingly, Defendants' motion for summary judgment is denied as to Plaintiffs' breach of contract claims against Francesco Borghese.

**IV.     Plaintiffs' Motion for Summary Judgment**

In their motion for summary judgment, Plaintiffs argue (1) that Francesco Borghese is liable for breach of contract as a matter of law, and (2) that Defendants' counterclaims for false advertising, breach of contract of the Quality Provision, and unjust enrichment all fail as a matter of law.

**A.     Breach of Contract Against Francesco Borghese**

Plaintiffs first argue that it is beyond genuine dispute that Francesco Borghese breached the 1993 Agreement.

To reiterate, in order to prevail on a claim for breach of contract, Plaintiffs must prove: "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach." *Diesel Props S.r.l.*, 631 F.3d at 52-53.

Plaintiffs contend that Francesco Borghese breached the 1993 Agreement as a matter of law by impermissibly using the Borghese trademark as well as by authorizing—and failing to prevent—the impermissible use of others.

### 1.      Francesco's Use of the Borghese Trademark

Regarding Francesco's own use, Plaintiffs point to the fact that Francesco's biography on the MME website states that he "is the son of Princess Marcella Borghese—creator of the Princess Marcella Borghese Cosmetics Line." (Pls.' Ex. 18 at D00417.)  Defendants acknowledge this use, but contend that this "use of Borghese and Princess Marcella Borghese is merely in the context of using their names or their ancestry. . . .  Nothing in the 1993 Agreement precludes Francesco or his family from using their names in the course of business."  (Defs.' Opp'n. at 6-7).

At issue here is whether Defendants were using the Borghese name descriptively or whether Defendants' use went "outside of the realm of descriptive, non-trademark use." *JA Apparel v. Abboud Corp.*, 682 F. Supp. 2d 294, 314 (S.D.N.Y. 2010*)*.  The question whether the use of a surname constitutes infringement or description is a particularly vexing one.  The general rule is that when, as in the present case, an individual sells only the right to use his name as a trademark and not the exclusive right to use his name commercially, then "the seller may advertise his affiliation with a new company, but must do so 'in a not overly intrusive manner.'" *Id.* at 312 (quoting *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986)). Courts tend to allow persons to use, at least in a limited sense, their own surnames in conjunction with business.  *See, e.g., Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 596 F.2d 731, 736 (2d Cir. 1978) (wherein a member of a famous wine family was prohibited from using his surname as a trademark, but was permitted to place his signature on his wine bottle with a disclaimer explaining that he was not associated with the Taylor Wine Company).  However, this is by no means a bright line rule.  *See, e.g.*, *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, No. 98 Civ. 9721 (PKL) (THK), No. 98 Civ. 0123 (PLK) (THK), 2002 WL 2012618, at *12-*13 (S.D.N.Y.

Sept. 3, 2002) (barring Alfredo Versace from using the name "Versace" in connection with the sale of goods and services).  Indeed, "[i]f an individual has previously sold 'use of his name and its goodwill, to the plaintiff, . . . courts will be especially alert to foreclose attempts by the seller to keep for himself the essential thing he sold, and also keep the price he got for it.'"  *JA Apparel Corp.*, 682 F. Supp. 2d at 312 (quoting *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979)).

In this case, it is clear that Francesco's and MME's invocation of the Princess and her cosmetics line approached the edge of the descriptive/infringement line, but the Court cannot say, as a matter of law, whether that line was crossed.  In instances such as this, the determination of whether Francesco's biography was "outside the realm of descriptive, non-trademark use" is properly left to the finder of fact.

## 2.  Francesco's Failure to Protect Plaintiffs' Trademark

Plaintiff next argues that Francesco authorized his son, Scipione, to use the Borghese trademark in the following October 9, 2006 email Scipione concerning a potential handbag product:

> You have to explain that the Borghese name has been sold by mother long time agao [sic].  Not so for Villa Borghese, therefore that should be available.  There is no guarantee that the Borghese company would not try to stop it.  But I think tjht [sic] rthey [sic] probably would not be successful, as the merchandise is also sold in different channels.  Why don't [sic] you make a deal and have mom [defendant Amanda Borghese] represent it and if it works you could put the jewelry too.

(Pls.' Ex. 22 at D434883.)  According to Plaintiffs, this was an "explicit[] authoriz[ation]" by Francesco to use the Borghese mark.

Irrespective of whether or not the use of "Villa Borghese" was infringement, Francesco has breached the 1993 Agreement only if he failed to "promptly inform" Plaintiff of "suspected infringements" or failed to cooperate with Plaintiffs' "reasonabl[e] requests to . . . protect"

28

Plaintiffs' mark.  The above-quoted email, however, does not necessarily demonstrate that Francesco "suspected" the use of Villa Borghese was an infringement on Plaintiffs' trademark. Therefore, the Court cannot determine, as a matter of law, that Francesco breached the agreement by authorizing the use of Plaintiffs' trademark.

Plaintiffs also claim that Francesco has breached the 1993 Agreement as a matter of law because, "[w]ith Francesco's knowledge, his family and [MME] have repeatedly used plaintiffs' registered trademarks."  (Pls.' Mem. at 7).  While Plaintiffs have not pointed to evidence proving that Francesco knew of the eleven alleged infringements enumerated in Plaintiffs' brief, Plaintiffs argue that, given the ubiquity of the infringements, this Court should presume his knowledge as a matter of law, as to do otherwise would be to permit Francesco to avoid his duties under the contract by remaining willfully blind.  (*Id*. at 8.)

However, the examples of alleged infringement put forth by Plaintiffs do not, in themselves and as a matter of law, illustrate Francesco's knowledge of infringement or his willful blindness.  While some of the eleven instances noted by Plaintiffs may well constitute infringement, Plaintiffs have not definitively shown a pattern of infringement so flagrant that Francesco's claim not to have known about the conduct constitutes a breach of the duty of good faith.  The jury will have to determine whether Francesco knew or should have known about the infringements against Plaintiffs.

Accordingly, genuine issues of material fact preclude summary judgment on Plaintiffs' breach of contract claim against Francesco Borghese.

**B.      Defendants' Counterclaims for False Advertising**

Defendants' Counterclaims I, III, and IV ("Defendants' False Advertising Claims")[10]

assert that Borghese has falsely advertised by averring to the public: (1) that its products are

"[b]uilt on a heritage that dates back to the 14th century," (Countercls. at ¶ 47), (2) that its

products are "made in Italy or are largely comprised [*sic*] of ingredients from Italy" (*Id.* at ¶ 49),

(3) that KS by Borghese products are "Borghese through and through" (*Id.* at ¶ 55), and (4) that

certain KS by Borghese products are "made from a primary ingredient other than water." (*Id* at ¶

54.)

Plaintiffs have moved for summary judgment as to Defendants' False Advertising

Claims.  In order to prevail on a claim under the Lanham Act,[11] a party must demonstrate both

that it has standing to sue and that the opposing party has engaged in false advertising.  Plaintiffs

claim that Defendants' False Advertising Claims fail on both fronts. (Pls.' Mem. at 17-30.)

─────────────────────

[10] Counterclaim I is a federal false advertising claim under 15 U.S.C. § 1125(A), while Claims III and IV are false advertising claims under the New York General Business Law §349-50 and New York common law, respectively.  Given that the state and federal law claims are analyzed under the same standard as the Lanham Act claim, this Court will analyze only Claim I in detail. *Ascentive, LLC v. Opinion Corp.*, 842 F.Supp.2d 450, 471 (E.D.N.Y. 2011); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc*., 800 F.Supp.2d 515, 538 (S.D.N.Y. 2011).

[11] Section 43(a) of the Lanham Act, as amended, states in relevant part:
>    (1) Any person who, on or in connection with any goods or services . . .
>        uses in commerce any word, term, name, symbol, or device, or any
>        combination thereof, or any false designation of origin, false or
>        misleading description of fact, or false or misleading representation of
>        fact, which – . . .
>            (B) in commercial advertising or promotion, misrepresents the
>                nature, characteristics, qualities, or geographic origin of his or
>                her or another person's goods, services, or commercial
>                activities,
> shall be liable in a civil action by any person who believes that he or she is
> or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

To establish standing, the complainant must have (1) a reasonable interest to be protected against the advertiser's false or misleading claims; and (2) a reasonable basis for believing that this interest is likely to be damaged by the false or misleading advertising.  15 U.S.C. § 1125(a)(1)(B).  "The 'reasonable basis' prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising."  *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994).  Nor can a complainant ask the Court to "presume[] . . . [t]he likelihood of injury"; rather, injury "must be demonstrated in some manner."  *Ortho Pharm. Corp.*, 32 F.3d at 694 (citation omitted).  Indeed, in cases "where the plaintiff's products are not obviously in competition with defendant's products, or the defendant's advertisements do not draw direct comparisons between the two," the Second Circuit has "tended to require a more substantial showing" of injury and causation.  *Id*.

Defendants have proffered no evidence that they have lost sales or suffered some other concrete harm as a result of Plaintiffs' advertising.  Instead, Defendants premise their standing to assert these False Advertising Claims on a "potential for reputational harm as a result of Plaintiffs' willful false advertising . . . ."  (Defs.' Opp'n. at 17.)  Defendants believe that Borghese's claim that its products are, for example, "[b]uilt on a heritage that dates back to the 14th century" has the potential to damage Defendants' reputation.  However, the Second Circuit has made clear that, in order to meet the standing requirement to bring Lanham Act claims, "plaintiff must show more than a 'subjective belief' that it will be damaged."  *Ortho Pharm. Corp.*, 32 F.3d at 694.  Moreover, as Plaintiffs correctly note, Defendants have provided this Court with "no authority for the proposition that a speculative *potential* for reputational harm satisfies the 'likely injury' requirement for a false advertising claim." (Pls.' Reply at 10.)  And indeed, the Second Circuit has explicitly stated that "speculative" injuries do not satisfy the

31

standing requirement.   *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir.

1988).

Therefore, this Court grants summary judgment as to Counterclaims I, III, and IV without

reaching the substance of the False Advertisement Claims made by Defendants.

### C.       Defendants' Counterclaim for Breach of Contract of the Quality Provision

Defendants' Counterclaim II concerns the Quality Provision in the 1993 Settlement

Agreement.  (*See* 1993 Agreement at § III.G.)  According to Defendants, Borghese breached the

Quality Provision by lowering "substantially, if not ceas[ing]" the sale of Borghese products in

"stores of high reputation and prestige," while "increas[ing] [Borghese products'] presence in

warehouse and drugstore chains, including Costco Wholesale and CVS."   Defendants allege

further that "certain products sold through such sales channels are not of a quality customarily

sold or provided through stores of high reputation and prestige, as required by the Settlement

Agreement."  (Countercls. at ¶ 70).  Plaintiffs have moved for summary judgment on this claim.

To prevail on a claim for breach of contract a party must prove: "(1) the existence of a

contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party;

and (4) damages attributable to the breach."  *Diesel Props S.r.l.*, 631 F.3d at 52-53.  A movant's

inability to prove any one element, either because of an absence of a "genuine issue of material

fact" or because of a lack of support, will "require an award of summary judgment."  *Marks v.

N.Y. Univ.*, 61 F. Supp. 2d 81, 88-89 (S.D.N.Y. 1999).  Plaintiffs argue that Defendants' Second

Counterclaim fails as a matter of law, because the damages claimed are not attributable to the

alleged breach.

A party cannot seek damages for a breach of contract unless the damages sought were

"within the contemplation of the parties at the time of contracting."  *Westerbeke Corp. v.*

*Daihatsu Motor Co.*, 304 F.3d 200, 209-10 (2d Cir. 2002) (Sotomayor, J.) (citing *Kenford Co. v. Erie*, 493 N.E.2d 234 (1986) ("*Kenford I*"). "[C]ourts should take a 'common sense' approach to determining whether damages were within the reasonable contemplation of the parties, by considering the nature, purpose and particular circumstances of the contract known by the parties, as well as the risks that defendant foresaw or should have foreseen at the time of contract." *Shred-It USA, Inc. v. Bartscher*, No. 02 Civ. 4082 (JO), 2005 WL 2367613, at *11 (E.D.N.Y. Sept. 27, 2005) (citing *Kenford Co. v. Erie*, 537 N.E.2d 176, 179 (1989) ("*Kenford II*")).

Here, the plain language of the contract indicates that the purpose of the Quality Provision was "to ensure that the Princess [defined to include Francesco and Livio] is not subjected to public ridicule or contempt,"   suggesting that the parties contemplated any damages from a beach to stem therefrom.  To conclude, as Defendants urge this Court to do, that the opening clause in the Quality Provision is trivial would be to "constru[e] a contractual provision in a manner that renders contractual language meaningless or superfluous," something which courts must strive to avoid doing.  *Eastman Kodak Co. v. STWB Inc.*, 232 F. Supp. 2d 74, 91 (S.D.N.Y. 2000); *see also Shaw Grp. Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (noting that, under New York law, "words and phrases in a contract should be given their plain meaning," and that a contract "should be construed so as to give full meaning and effect to all of its provisions" (citation and internal quotation marks omitted)).   Nothing in the record indicates that Francesco or Livio suffered any such "public ridicule or contempt" from Borghese's behavior.[12]

---

[12] *See, e.g.,* Pls.' Ex. 69 at Interrogatory No. 9 (wherein Defendants fail to set forth any allegations that they have been subject to public ridicule or contempt); Pls.' Ex 128 ("Livio

Moreover, even if Defendants could show a genuine dispute of material fact as to damages, their theory of breach relies on a reading of the Quality Provision that is not supported by its plain language.  Defendants contend that Plaintiffs have "cheapened their brand" by selling it in certain stores as opposed to others.  (Defs.' Opp'n. at 9.)  However, the Quality Provision concerns not the "cheapening" of the brand by placing it next to products of a lower quality, but rather the "quality" of Plaintiffs' products themselves.  While it is true that the Quality Provision makes reference to "stores of high reputation and prestige," it does so *not* as part of a requirement for where products are sold, but rather as a reference point for "quality":  Plaintiffs' products must be "*of a quality customarily sold or provided through stores of high reputation and prestige.*"[13]  Defendants' contention that the Quality Provision mandates that the goods be sold by particular stores is simply incorrect.  (See Defs.' SUF at ¶ 14.)  Nor is the nature of the packaging used by Plaintiffs (*see id.* at ¶ 9) sufficient to create a genuine issue of material fact as to whether the Plaintiffs' *products themselves* were of a certain *quality*.  Defendants' evidence, including the expert report of Dr. Robert A. Grayson, is insufficient to create a genuine dispute of fact on that issue.  (*See* Pls.' Ex. 71 ("Grayson Report") at 7 (explaining that his opinion about the quality of the KS by Borghese products is "based on [their] packaging").)

Accordingly, Plaintiff's motion for summary judgment on Defendants' Second Counterclaim must be granted.

---

Dep.") at 21:22 -22:23 (Livio's testimony that, to his knowledge, neither he nor his mother has been subjected to any public ridicule or contempt as a result of the quality of Borghese products).

[13] In the context of the contractual provision, it is clear that the intended meaning of the word "quality" is that of "degree of excellence," and not the alternative meaning of "nature" or "character."  That is confirmed by both the purpose clause of the provision ("to ensure that the Princess is not subjected to public ridicule or contempt") and the reference to "stores of high reputation and prestige."

### D.      Defendants' Counterclaim for Unjust Enrichment

Plaintiffs next move for summary judgment on Defendants' Counterclaim V for unjust

enrichment.  Counterclaim V stems from the national exposure received by Plaintiffs as a result

of Lorenzo's filming of a promotional segment for *The Bachelor: Rome* in Plaintiffs' New York

offices.  As explained *supra*, a brief clip of Lorenzo at Plaintiffs' offices aired on *Extra!* on

October 2, 2006.  Defendants' expert quantifies the value of the free air time received by

Borghese as between $43,000 and $61,000.  (Defs.' Ex. 21 ("Susmann Report") at ¶¶ 27-29).

Defendants have presented some, albeit anecdotal, evidence that the air time might have

increased Borghese's sales.  (Defs.' Ex. 20 at BORGHESE0012190.)

To prevail on a claim for unjust enrichment under New York law, a plaintiff must

demonstrate: "(1) the performance of the services in good faith, (2) the acceptance of the services

by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4)

the reasonable value of the services."  *Joan Hansen & Co. v. Everlast World's Boxing

Headquarters Corp.*, 744 N.Y.S.2d 384, 389 (App. Div. 2002).  A claimant must demonstrate

that a genuine issue of material fact exists as to each element of this claim in order to survive a

motion for summary judgment.

Plaintiffs contend that Defendants' unjust enrichment claim must fail because, *inter alia*,

any benefit received by Plaintiffs was not at Defendants' expense. As this Court has explained

elsewhere, "under New York law, a plaintiff must plead some expectation of compensation that

was denied in order to recover under a theory of unjust enrichment."  *Tasini v. AOL, Inc.*, 851 F.

Supp. 2d 734, 741 (S.D.N.Y. 2012); *Estate of Goth v. Tremble,* 873 N.Y.S.2d 364, 367–68 (App.

Div. 2009) (concluding that defendant's unjust enrichment counterclaim was defeated by the

"defendant's candid admissions that he voluntarily provided services . . . without expectation of any compensation").

In this case, Lorenzo could not have had a reasonable expectation of compensation from Borghese.  While the record reflects that Lorenzo and Borghese were in negotiations for Lorenzo to serve as a short-term "consultant" for Borghese "[i]n exchange for the use of the [Borghese] offices," (Pls.' Ex. 101 at D001476), no agreement was ever reached.  (Defs.' Countercls. at ¶ 36.)[14]  Indeed, on July 19, 2006, Borghese CEO Georgette Mosbacher wrote Lorenzo an email confirming that the parties "have not reached a binding agreement regarding a future business relationship between them or the use of any footage shot in Borghese's offices for ABC's 'The Bachelor.'  Accordingly . . . neither party will have any liability or future responsibility to the other with respect to these matters."  (Pls.' Ex. 101 at D001477.)

Moreover, the record reflects that Lorenzo had no desire or expectation that any clips from the Borghese offices would air.  Quite the contrary, Lorenzo "was promised by numerous people numerous times that no footage shot at the Borghese offices would appear on TV" and that Lorenzo was "very concerned" about the fact that, "[f]or some reason, the clips of me in Borghese's offices did air."  (Pls.' Ex. 102; *see also* Pls.' Ex. 118 at 258: 8-20 (wherein Lorenzo recalls a telephone conversation in which he requested the shots in the Borghese offices not be aired).)  Given both parties' hopes that no footage from the Borghese offices would air, it is clear that Lorenzo had no expectation of compensation, nor did Borghese accept the services rendered.

---

[14] Of course, had there been a contract between the parties, Defendants could not bring this claim for unjust enrichment.  *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.").

Thus, Defendants' unjust enrichment claim is without merit, and cannot survive summary judgment.

## V.      The Parties' Motions to Strike

In connection with the cross-motions for summary judgment, Defendants have moved to strike portions of the declaration of Neil Petrocelli as well as Plaintiffs' Compilation of Borghese's Local Civil Rule 56.1 and Defendant's Responses, Color-Coded to Show Defendant's Admissions ("Color-Coded Compilation"), while Plaintiffs have moved to strike portions of the declaration of Scipione Borghese.  (Dkt. No. 105; Dkt. No. 115; Dkt. No. 109.) Reading these motions, this Court cannot help but recall Charles Dickens' rumination that a "great principle of the . . . law is, to make business for itself."  Charles Dickens, BLEAK HOUSE 621 (Nichola Bradbury ed., Penguin Classics 1997).  The numerous briefs submitted in connection with these motions must have required hours upon hours of attorney work time, but did little, if anything, to advance the cause of either party. Nonetheless, the motions will briefly be considered in turn.

### A.      Color-Coded Compilation

Defendants have moved to strike Plaintiff's Color-Coded Compilation as improper. However, the merits of Defendant's motion to strike need not be addressed, as the Court did not rely on Plaintiff's Color-Coded Compilation in deciding the motions to dismiss discussed in this opinion.  Thus, Defendant's motion to strike is denied as moot.

### B.      Scipione Declaration

Plaintiffs have moved to strike various sections of Scipione Borghese's declaration.  In assessing the validity of the Defendants' laches defense, this Court considered paragraphs 14 and 15 of Scipione's declaration.  However, summary judgment based was not granted based on

laches, the evidentiary value of the statements in paragraphs 14 and 15 is moot.  In any event, this Court rejects Defendant's characterization of these statements as vague, conclusory, and containing inadmissible hearsay.

The remaining objections lodged by Plaintiffs are also moot.  They are additionally largely unfounded.  For instance, Plaintiffs argue that paragraphs 23-28, which provide descriptions of video exhibits submitted to this Court, violate Federal Rule of Evidence 1006, often referred to as the "best evidence rule."  This Court disagrees.  Paragraphs 23-28 contain permissible summaries of the videos, and thus are admissible.  The Plaintiffs' objections to the remaining paragraphs (11-16, 19-21, and 32) are primarily that the paragraphs are conclusory, self serving, made without personal knowledge, unsubstantiated, and contradicted by the record.  However, Scipione has sufficient personal knowledge to make all of the statements in his declaration.  To the extent that some of the statements are contradicted by other parts of the record, that fact goes to the weight to be given to the particular piece of evidence.

### C.        Petrocelli Declaration

Defendants' motion to strike paragraphs 5-13 of Neil Petrocelli's declaration is denied as moot.  The purpose of Petrocelli's statements in this section of his Declaration was apparently to bolster Plaintiffs' defenses against defendants' False Advertising Claims.  However, because this Court has dismissed those claims on standing grounds, Petrocelli's statements are no longer relevant.  In any event, this Court did not rely on any of the statements made by Petrocelli in paragraphs 5-13 of his Declaration in resolving the motions for summary judgment.

Accordingly, Plaintiffs and Defendants' motions to strike are denied as moot.  To the extent they are not moot, they are denied on the merits.

**VI.    Conclusion**

For the foregoing reasons, Plaintiffs' motion for partial summary judgment is GRANTED

in part and DENIED in part, as follows:  All of Defendants' Counterclaims are dismissed.

Summary judgment is denied as to the rest of Plaintiff's motion.

Defendants' motion for partial summary judgment is also GRANTED in part and DENIED

in part, as follows:  Plaintiff's breach of contract claims against MME are dismissed.  Summary

judgment is denied as to the rest of Defendant's motion.

The Clerk of the Court is directed to close the motions at Docket Nos. 73, 81 105, 109, and

115.


SO ORDERED.

Dated:  New York, New York
        January 14, 2012

                                        _____
                                                J. PAUL OETKEN
                                            United States District Judge